ARKANSAS NATIONAL BANK *v.* STUCKEY.

Opinion delivered November 29, 1915.

1. ATTACHMENT—SALE OF PROPERTY BY INSOLVENT DEBTOR.—The sale of property by an insolvent debtor in the usual course of business or for the purpose of paying his debts, does not constitute ground for attachment; but where it can be shown that such sale was made for the fraudulent purpose of converting the property into money, so as to place it beyond the reach of creditors by execution or other process, a ground for attachment is made under the statute.

2. ATTACHMENTS—INSOLVENCY OF DEBTOR—EVIDENCE OF INSOLVENCY.—The mere fact that a debtor is insolvent, will not constitute a ground for levying an attachment, but when a debtor has undertaken to dispose of his property, proof of his insolvency is competent as tending to shed light on his motives in disposing of his property.

3. ATTACHMENTS—ATTEMPTED SALE OF PROPERTY BY INSOLVENT DEBTOR.—Defendant owed a certain sum of money to plaintiff, and in conjunction with his wife, attempted to sell a certain lot of land, on time; defendant was at the time insolvent. *Held*, under the evidence that a finding by the chancellor that an attachment at the instance of the plaintiff should be denied, would not be disturbed on appeal.

4. ATTACHMENTS—REAL ESTATE—DAMAGES TO DEFENDANT.—A., who was indebted to B., made a contract to sell a certain piece of property for $2,500. B. levied an attachment against the same. *Held*, there being no statutory grounds for the attachment, and the land depreciating in value $250, that an award of $250 damages to defendant, by the chancellor, would be sustained.

5.  ATTACHMENTS—EFFECT ON TITLE.—The levying of an attachment
on land does not divest the owner of his general property in the
land, but constitutes only a lien on it in favor of the attaching
creditor.

6.  ATTACHMENTS—REAL ESTATE—DAMAGES.—It is improper to award
damages to a debtor landowner, where certain pasture and truck
property was erroneously attached by a plaintiff creditor, since
the attachment did not deprive the owner of control over the prop-
erty nor the right to rent or cultivate the same.

7.  ATTACHMENTS—DISCHARGE—DAMAGES—ATTORNEY'S FEES.—Upon the
discharge of an attachment, only such damages can be recovered
by the defendant as are actually and naturally the direct conse-
quence of the attachment; such damages do not include attorney's
fees.

8.  ATTORNEY'S FEES—AMOUNT—FINDING OF CHANCELLOR.—The finding of
the chancellor that an attorney was entitled to $150 fees for fore-
closing a mortgage, will not be disturbed on appeal.

9.  JUDGMENT LIENS—HOMESTEAD.—A judgment rendered against a de-
fendant becomes a lien, from the date of its rendition, on the lands
of the defendant in that county, except upon his homestead. which
is exempt.

Appeal from Washington Chancery Court; *T. H.
Humphreys,* Chancellor; reversed.

STATEMENT BY THE COURT.

The Arkansas National Bank instituted this action in
the circuit court against W. L. Stuckey to recover ap-
proximately $4,500, principal and interest, alleged to be
due by said Stuckey to the bank for borrowed money. On
the day suit was instituted, viz.: January 20, 1914, the
plaintiff made an affidavit that the defendant had dis-
posed of his property with the fraudulent intent to cheat,
hinder and delay his creditors and that he was about to
sell his property with such fraudulent intent. An attach-
ment was issued and levied upon certain real estate be-
longing to the defendant.

The defendant first became indebted to the bank in
the sum of $500 in 1908. He owned a farm in Washing-
ton County comprising 190 acres, eighty acres of which
constituted his homestead. There was a house on this
in which he resided and which cost about $2,000. Desir-
ing to build a larger house he borrowed money from the
plaintiff bank for that purpose and used it in erecting an

addition to his house which cost, he says, $4,000. The money so borrowed is the foundation of this action.

In 1899 the defendant borrowed $3,500 from Dr. W. B. Welch and conveyed his farm above referred to, comprising 190 acres, to Doctor Welch, and Doctor Welch at the same time executed an instrument agreeing to reconvey the farm to the defendant and his wife upon the payment of the money borrowed. It is agreed by both the defendant and Doctor Welch that this was intended to be a mortgage and not an absolute conveyance of the property of the defendant. The defendant kept the interest on the loan from Doctor Welch paid up until 1912; after that he did not pay any interest.

The defendant also owned 696 shares of stock in the Ozark White Lime Company of the par value of $17,400. He borrowed about $7,000 from the McIllroy Banking Company and pledged this stock to it as collateral. He also borrowed about $500 from the president of that bank and executed a chattel mortgage on five horses and mules and his law library to secure him. This mortgage was executed December 30, 1913, and became due March 30, 1914. The defendant says that his law library cost about $2,000 but that he couldn't sell it for more than $500. The horses and mules mortgaged were valued at $625.

The defendant at the time this suit was instituted was also indebted to Col. Hugh Dinsmore in the sum of $700 and to a bank at Springdale, in Washington County, Arkansas, in the sum of $600.

The plaintiff asked that Doctor Welch be made a party to this suit and be required to foreclose the lien on the defendant's farm; that the McIllroy Banking Company also be made a party to the suit and required to foreclose its lien on the corporate stock deposited with it as collateral; and that the case be transferred to the chancery court, which was done and the cause there determined on the 13th day of March, 1915.

The chancellor dismissed the attachment and rendered judgment for the plaintiff against the defendant in the aggregate sum of $4,062.66. The defendant was also

allowed certain damages which were deducted from the judgment. The amount and different items of damages allowed the defendant will be more particularly referred to later.

The court also found that the defendant was indebted to Doctor Welch in the sum of $4,386.66, principal and interest, and ordered the land mortgaged to secure it to be sold in payment of said indebtedness. The 110 acres exclusive of the homestead was ordered sold first; and if that did not pay the debt the remaining eighty acres which constituted the homestead of the defendant was ordered sold in payment of the balance. The amount, if any, that was left after paying the judgment in favor of Doctor Welch was ordered by the chancellor to be held by the commissioners for the further orders of the court as to its disposition.

Other evidence will be stated in the opinion. From the decree entered of record both plaintiff and defendant have appealed.

*McDonald & Grabiel,* for appellant.

1. The attachment should have been sustained for the grounds alleged. 80 Ark. 391; 63 Mich. 105; 29 N. Y. 679; 16 Neb. 91; 4 Cyc. 420; 60 Ark. 162; 4 Cyc. 415, 416, and note, 865-868-9; 64 Ark. 417.

2. The damages assessed are unwarranted. 37 Ark. 620, 621-623; 4 Cyc. 880. They are too remote. 8 Am. & E. Enc. Law. (2 ed.), 542; 47 Ark. 527; 51 *Id.* 384; 36 *Id.* 524; 63 *Id.* 251. Expenses of suit should not have been allowed. 51 Ark. 384; 51 *Id.* 384.

3. The court erred in dismissing the bill for specific performance against Burnips and Crosby. 96 Ark. 189; 105 *Id.* 641; 91 *Id.* 383; 102 *Id.* 380; 89 *Id.* 321; 64 *Id.* 462, 465; 21 *Id.* 112.

*W. L. Stuckey, Hill, Brizzolara & Fitzhugh* and *John Mayes,* for appellees.

1. The evidence fully sustains the finding of the chancellor that the attachment was groundless. 111 Ark. 83, 449, 589; 53 *Id.* 75, 327, 537; 54 *Id.* 229; 55 *Id.* 329.

2. The damages allowed were actual and compensatory and properly allowed.

*Walker & Walker,* for the Burnips and Crosby.

The bank was not entitled to specific performance. Pomeroy on Spec. Performance, § § 57, 166, p. 233; 36 Cyc. 622. Specific performance is not an absolute right, but a matter of discretion. 19 Ark. 59; Pom. on Spec. Perf., § § 185, etc., p. 65; 36 Cyc. 617, 619, 725; 6 Wheat (U. S.) 528; 37 Fed. 422; Fry on Spec. Perf., § 715; 15 Mich. 499; 45 *Id.* 223; 5 Ves. 720.

*John Mayes* and *Hill, Brizzolara & Fitzhugh,* for cross-appellant Stuckey.

1. Attorneys fees should have been allowed as damages. 4 Cyc., pp. 885-6.

2. It was error to order the homestead sold. 63 Ark. 289; 70 *Id.* 343; 55 *Id.* 139; 10 Enc. Pl. & Pr., p. 81; 22 Pac. 580; 50 N. W. 235; 64 Mich. 412; 46 Cal. 638; 31 Ark. 203; 29 *Id.* 202; 66 *Id.* 385; 87 *Id.* 368.

HART, J., (after stating the facts). The principal contention between the parties to this suit is as to the question of whether the attachment should have been sustained. The record shows that the defendant first became indebted to the plaintiff in 1908 in the sum of $500. In the next few years he borrowed additional sums from the plaintiff to be used in improving his farm which was situated in Washington County, Arkansas. He gave his notes for the amounts so borrowed payable ninety days after date and these notes were renewed from time to time as they became due. These renewal notes became due in May and June, 1913, and before and after they became due the bank notified the defendant that it demanded payment of the notes. The officers of the bank pressed the defendant for the payment of the notes all during the year 1913. The defendant owned his farm of 190 acres which he testified was worth more than $20,000 and which the officers of the bank and other witnesses testified was not worth more than $10,000. The corporate stock of the defendant, above referred to, began to depreciate in value so that by the latter part of 1913 it was

variously estimated from forty to sixty per cent of its face value.

The defendant also owned a lot in the Mt. Nord addition to the City of Fayetteville the value of which was variously estimated at from $2,000 to $2,500. He also owned some other tracts of land in Washington County which he valued, altogether, at about two or three thousand dollars. In fact the defendant estimated all of his property to be worth a great deal more than the amount owed by him but according to the testimony of the plaintiff he was insolvent at the end of 1913. At any event he did not have any ready money in 1913 and was being pressed by the bank for the payment of the amount owed to it.

The president of the bank stated that at the time he lent the money to the defendant he did not know that he was indebted to Doctor Welch in the sum of $3,500 for borrowed money or that he had borrowed $7,000 from the McIllroy Banking Company. It appears that the president of the bank and the defendant had been on good terms up until sometime in 1913. The bank made repeated demands in 1913 for the payment of the amount due it and the defendant made repeated promises to pay it but did not do so. He had promised to sell the lot on Mt. Nord in the city of Fayetteville and to apply the proceeds towards the payment of the amount due the bank. He became a candidate for Congress in the fall of 1913 but assured the bank that he was not going to spend any money in his race. On the 30th day of December, 1913, he sent the bank a statement in which he promised to sell the lot on Mt. Nord and to apply the proceeds towards the payment of his debt to the bank. The president of the bank testified that he said he would sell the lot and pay the bank by the 10th of January, 1914, but the defendant denies that there was any time limit made.

On the 17th day of January, 1914, while the defendant was away on his campaign in an adjoining county, his wife entered into a written contract with Robert Burnip for the sale of the Mt. Nord lot for the price of $2,250, one hundred dollars of which was to be paid in cash and

the remainder to be paid on the 10th day of March, 1914, The contract was signed by Mrs. Stuckey and witnessed by H. E. Crosby, a son-in-law of Robert Burnip. Burnip gave her a check on a bank in Fayetteville for the $100 and Mrs. Stuckey kept this check three days before sending it to the bank for collection. Burnip was a man of some means and had just moved to Fayetteville for the benefit of his health.

A neighbor of Mrs. Stuckey's testified that on the day after Mrs. Stuckey made the contract with Burnip for the sale of the lot on Mt. Nord she told her that she, Mrs. Stuckey, was going to get the cash on the sale and that she was going to put the money in her "jeans." Mrs. Stuckey denied that she told her neighbor that she was going to put the money in her "jeans" and stated that it was her intention and the intention of her husband that the proceeds of the sale of the lot should be applied towards the satisfaction of the defendant's debt to the bank.

Mrs. Gullege was the neighbor who testified that Mrs. Stuckey had told her that she intended to keep the money derived from the sale of the lot, and Mrs. Pritchard, another neighbor, testified that Mrs. Gullege had told her of her conversation with Mrs. Stuckey and that she had repeated it to her husband; that she understood that Mrs. Stuckey had sold the lot the day before and already had the money in her possession. That is to say, it was told her that Mrs. Stuckey had the money "in her jeans." Mrs. Pritchard's husband was a stockholder in the plaintiff bank at the time this was told him. He immediately notified the president of the bank and the president at once instituted this action against the defendant and sued out a writ of attachment which was levied upon the lot in question as well as upon other real estate belonging to the defendant.

The defendant took the stand in his own behalf and told of the friendship which had formerly existed between him and the officers of the bank and of the bitterness which then existed between the president of the bank and himself. He said that ill feeling existed between them

and that he had no confidence in the integrity of the president of the bank. Jay Fullbright was president of the bank and the defendant testifies that he had told him all during the year of 1913 that he wanted to sell off some of his property and pay the bank; that Fullbright had suggested that he deed the Mt. Nord lot to the bank and that when the bank sold it the proceeds would be applied toward the payment of the debt and says that he refused to do this because of his lack of confidence in the integrity of Fullbright. He stated that he told Fullbright that he was perfectly willing that the lot should be sold and the proceeds applied to the payment of his debt to the bank. He also testified that when his wife called him up and told him about making the contract he told her not to let Fullbright in any manner interfere with the trade. He stated that it was his intention that the proceeds should be turned over to the bank in payment of his debt. During the year 1913 the defendant made several efforts to mortgage his property for sufficient money to pay his debts, but failed to do so.

(1-2)  A great mass of testimony was taken in this case which we deem it unnecessary to abstract. It is the settled rule of this court that the findings of fact made by a chancellor will not be disturbed on appeal unless against the clear preponderance of the evidence. Tested by this well known rule, we must uphold the decision of the chancellor in dismissing the attachment. As we have already seen there was a dispute as to whether or not the defendant was insolvent at the time the attachment was sued out. The undisputed evidence, however, does show that the defendant at that time had no ready money and that he was being pressed for the payment of his debt to the bank. For the purposes of this decision, however, it may be conceded that he was insolvent at the time the attachment was sued out. The attachment was obtained under section 344 of Kirby's Digest on the ground that the defendant had sold his property with the fraudulent intent to cheat, hinder and delay the bank in the collection of its claim and that he was about to sell his property with such intent. The sale of property by an insol-

vent debtor in the usual course of business or for the purpose of paying his debts does not constitute ground for attachment; but where it can be shown that such sale was made for the fraudulent purpose of converting the property into money, so as to place it beyond the reach of creditors by execution or other process, it is ground for attachment under our statute. *Farris* v. *Gross,* 75 Ark. 391. The fact of. the insolvency of the defendant itself is not a ground of attachment; but proof of his insolvency was competent as tending to shed light on his motives in disposing of his property. The evidence shows that the defendant had been trying to sell his Mt. Nord lot all during the fall of 1913 and that the bank knew that he was trying to sell it and acquiesced in his doing so. On the last day of the year he sent a written statement to the bank in which he declared that he would sell his lot and apply the proceeds to the payment of his debt. So the bank knew that he was trying to sell the lot and made no objection to his doing so. Early in January the defendant's wife made a written contract for the sale of the lot for $2,250, one hundred dollars of which was to be paid in cash and the balance in the following March. The record shows that the purchaser was a man of some means and the fact that a cash payment of all the purchase price was not demanded tends to show that it was not the purpose of the defendant to sell the lot and pocket the proceeds of the sale.

(3)    Burnip, the prospective purchaser, died before this suit was tried but his son-in-law was a witness to the contract and could have been produced as a witness by the plaintiff, or his deposition could have been taken, to prove that Mrs. Stuckey at the time the contract was entered into had said or done anything that indicated she was trying to sell the property and pocket the proceeds. It is true that Mrs. Gullege testified that she said she intended to keep the proceeds of the sale of the lot but Mrs. Stuckey denies that she intended to do this and says that she only stated this to Mrs. Gullege as a joke.

The testimony of Mrs. Pritchard is hearsay and, of course, has no probative value.

It appears from the record that the remark of Mrs. Stuckey to Mrs. Gullege was the cause of the attachment being sued out in this case. The record is voluminous and shows that the chancellor carefully heard and considered all of the evidence regarding the matter which was introduced before him. When this is considered, together with all the surrounding facts and circumstances, we are of the opinion that the finding of the chancellor in favor of the defendant on the attachment branch of the case should not be disturbed.

On the question of damages the court allowed the defendant $250 as a result of the failure of the sale of the Mt. Nord lot. As we have already seen Burnip agreed to pay for this lot $2,250. After the attachment was levied upon it he stopped payment upon his check and refused to further perform the contract. Finally an agreement was gotten up among plaintiff, defendant and Burnip to the effect that Burnip should complete his contract and pay the purchase price of the lot into court to be held until the determination of the action. Before that agreement was completed, however, Burnip died and his heirs refused to carry it out. The lot depreciated in value so that at the time of the trial it was only worth $2,000. Therefore we do not think the court erred in allowing this item of damages.

(4) In this connection it may be stated that the heirs of Burnip were made parties to the suit and specific performance of the contract asked by the bank. The court denied this relief to the bank and we think it was right. Burnip made the contract with Mrs. Stuckey as agent for the defendant before the attachment was issued and levied. It is true that Burnip afterwards agreed with the plaintiff that he would carry out the contract but there was no mutuality in that agreement. It was a voluntary act on the part of Burnip and, there being no consideration for it, the plaintiff had no right to have specific performance decreed.

The court allowed the defendant $180 damages for loss of pasturage and it is contended by counsel for the bank that this was error. We agree with counsel in this

contention. On this point the defendant Stuckey testified that he had been in the habit of renting out his pastures and that he had sufficient pasturage for thirty head of stock but says that he could not afford to make contracts with people who had stock because he supposed the case would be tried in April after the attachment was issued and he did not know what would be the result of the suit.

(5)  The attachment of the land did not divest him of his general property in the land but only constituted a lien on it in favor of the attaching creditor. *Merrick and Fenno* v. *Hutt*, 15 Ark. 331.

(6)  The plaintiff did not attempt to interfere in any way whatever with the defendant in the exercise of his ownership over the land pending the suit and the defendant went ahead exercising acts of ownership over it just as he had done before the attachment was levied. He does not testify that owners of stock refused to make any contracts with him because of the attachment.

We think the court erred in allowing him this item of damages.

For the same reason we think the court erred in assessing damages against the plaintiff in the sum of $224 for loss of rent on twenty-eight acres of strawberry land. This land was rented for four dollars per acre and the testimony shows that strawberries planted in the winter or spring of 1914 would not bear until the following year. It appears that the wife of the defendant would have had charge of this strawberry land and there is no reason why she should not have gone ahead in the preparation of the land for strawberries just as if no attachment had been issued. She knew all of the facts which caused the issuance of the attachment. Besides, no attempt was made to interfere with her in the possession of the land.

(7)  It is contended by counsel for the defendant that the court should have allowed him $500 as attorney's fees for defending the attachment. Upon the discharge of an attachment only such damages can be recovered by the defendant as are actually and naturally the direct consequences of the attachment. This does not include at-

torneys fees. *Patton* v. *Garrett,* 37 Ark. 605; *Jacobson* v. *Poindexter,* 42 Ark. 97.

(8) Counsel for the defendant also claim that the court erred in allowing him only $150 attorney's fees due him by the bank. We do not agree with him in this contention. The facts on this point are that in 1911, while the defendant was friendly with the officers of the bank, he was employed by the bank as an attorney to foreclose a mortgage. There was sufficient evidence to support the finding of the chancellor that the attorney's fees were only worth $150 instead of $500 as claimed by the defendant. Besides this, the foreclosure proceedings were in the court presided over by the chancellor who tried the present case and, being familiar with the services rendered, the chancellor could, to some extent, act upon his own knowledge of their value and we would not overturn his finding thereon unless clearly erroneous. *Jacoway* v. *Hall,* 67 Ark. 340.

The record shows that the plaintiff owned a farm comprising 190 acres in a body. The value of this farm was variously estimated at from ten to twenty thousand dollars, eighty acres of it being claimed by the defendant as a homestead. The court ordered that as between him and Doctor Welch the 110 acres excluding the homestead should first be sold and the proceeds applied to the satisfaction of Doctor Welch's debt; and that if anything was unpaid the remaining eighty acres should be sold and the proceeds applied towards the payment of the remainder, and that the balance, if any, should be brought into court and distributed among the creditors of the defendant and himself as the court should thereafter order.

It is the contention of counsel for the defendant that this would prevent him from paying off the balance of his mortgage debt to Doctor Welch if the sale of the 110 acres did not pay it. In this contention he is wrong. He could go in before any part of his land was sold and pay Doctor Welch what he owed him and this payment would satisfy the mortgage in favor of Doctor Welch.

Again, if the sale of the 110 acres under the decree failed to fully satisfy the mortgage the defendant could

then go in and pay Doctor Welch the balance and relieve his land of the mortgage lien against it in favor of Doctor Welch.

In other words, if the defendant Stuckey should pay off his mortgage debt to Doctor Welch or if it should be satisfied by a sale of all or a part of the mortgaged property under foreclosure proceedings, the mortgage would be extinguished and the property freed from the mortgage lien.

(9) We have held that the decision of the chancellor dissolving the attachment is not against the weight of the evidence and that his decree in that respect should not be reversed. Therefore the property of the defendant Stuckey is released from any lien under the attachment. The chancellor rendered judgment against Stuckey for the amount due by him to the bank. His decision in this respect was correct and under section 4438 of Kirby's Digest the judgment was a lien on the lands of the defendant in Washington County from the date of the rendition of the decree. Stuckey claimed eighty acres of his land as a homestead and under the facts as disclosed by the record his homestead was exempt from execution under the judgment rendered against him in favor of the bank. See sections 3 and 4, article 9, of our Constitution.

The result of our views is that the court correctly found the amount due the plaintiff bank and the amount due Doctor Welch. The defendant was only entitled to recover $250 and the accrued interest as damages and $150 and the accrued interest as attorney's fees for services rendered, as indicated in the opinion.

The decree will be reversed and the cause remanded with directions to the chancellor to enter a decree in accordance with this opinion.