ROMER *v.* LEYNER.

5-606                                   277 S. W. 2d 66

Opinion delivered March 28, 1955.

[Rehearing denied April 25, 1955.]

*Q. Byrum Hurst* and *C. A. Stanfield,* for appellant.

*Maxwell E. Kaps, Wootton, Land & Matthews, Virgil Evans* and *Walter J. Hebert,* for appellee.

WARD, J. This case relates to the sale of a hotel court in Hot Springs, Arkansas, and the issues arise from two conflicting sales agreements. Also involved is the issue of damages claimed by each of the contracting vendees. Helen R. Romer, Romona Horwitz and Howard L. Romer, as trustees, owned and operated the Romer Hotel Court in Hot Springs, Arkansas. Helen R. Romer, acting for herself and for the others mentioned above, handled all negotiations relative to this litigation

and we shall hereafter refer to the owner as "Romer." One of the contracting purchasers was Samuel L. Leyner and Romer Hotel Court, Inc. [a Delaware Corporation] and most of the negotiations relative to this case were conducted by Samuel L. Leyner, and this party we shall hereafter refer to as "Leyner." The other contracting purchaser was a partnership composed of Irving Dexter and Armin Miller, and we shall hereafter refer to this party as "Dexter-Miller."

On September 4, 1953, Romer and Leyner entered into a written agreement whereby, generally, Romer offered to sell and Leyner offered to buy the Hotel Court for the price of $500,000. This writing, hereafter referred to as the "Agreement," also provided, generally, that the purchase price was to be paid as follows: (a) $10,000 paid to Romer on execution of the Agreement; (b) Leyner was to secure a $350,000 first mortgage on the Hotel Court [this was to take the place of an existing mortgage of $260,000], and the proceeds, less the existing mortgage, were to go to Romer; (c) Leyner or his assigns were to execute a note to Romer for $90,000 secured by a mortgage on the Hotel Court subject to the $350,000 mortgage, and; (d) Leyner was to pay $50,000 upon delivery of the deed. The provisions in the Agreement relating to the time allowed Leyner in which to complete the contract appear not to have been interpreted alike by Romer and Leyner. Romer appears to have been under the impression that the deal was to be consummated within 90 days from the date of the execution of the Agreement, while Leyner apparently considered that he had 90 days in which to accept the offer of sale and that the sale was to be consummated at a later fixed date. It is not necessary to set out the exact language bearing on this issue nor is it necessary for us to put our interpretation on its meaning since, as will be seen later, the question is now moot.

Regardless of Leyner's rights under the Agreement he notified Romer a day or so before the 90 day period had expired to the effect that he was ready to complete the purchase, and negotiations to that end ensued.

We gather from the record that as the end of the option period approached and Leyner had failed to exercise his option or rights under the Agreement Romer became fearful that Leyner was not going to buy the Hotel Court and she entered negotiations to sell the property to Dexter-Miller, which resulted in a written contract dated December 7, 1953, whereby she agreed to sell and Dexter-Miller agreed to buy the Hotel Court for the price of [what amounted to] $455,500. The closing date was set by the contract for December 15, 1953. It is now admitted by Dexter-Miller that at the time this contract was entered into they knew of the Agreement which Romer had executed with Leyner.

A short time later when Leyner learned of the contract with Dexter-Miller he filed a suit in Chancery Court on December 15, 1953, against Romer and Dexter-Miller to enforce specific performance and to clear the title of the Dexter-Miller contract. On December 16, 1953, Romer wired Leyner that inasmuch as suit had been filed she expected the purchase money to be paid at once and asked him to close the deal immediately, and on the same day Romer through her attorney advised Dexter-Miller that she was willing to complete her sale to them. On December 28, 1953, which was the date set by Leyner for closing the deal with Romer, Romer executed a ratification of the September 4th Agreement. This written ratification was filed for record the following day.

Apparently all efforts to reconcile the differences between the three parties failed and Leyner, on March 4, 1954, filed an amendment to his complaint asking to be reimbursed for expenses incurred because of Romer's alleged breach of contract, to-wit: $3,500 attorney fees to local attorneys, $2,500 attorney fees incurred since December 15, 1953, to a New Jersey attorney, and $1,855.43 for travel, hotels and other miscellaneous expenses.

Before Leyner filed his amended complaint as mentioned above, Romer, on January 4, 1954, filed her an-

swer, admitting the execution of the Agreement but alleging that Leyner had not complied with the terms of the Agreement within the specified time of 90 days and asked that Leyner's complaint be dismissed.

On February 15, 1954, Dexter-Miller answered admitting the existence of the Romer-Leyner Agreement and asserting their contract with Romer dated December 7, 1953. At the same time by way of cross-complaint against Romer it was alleged that they were ready, able and willing to perform the December 7th contract but that Romer had failed and refused to perform; that they had notice of the September 4th Agreement since its recordation on December 14, 1953; that they were excused from performing their contract with Romer; that they were deprived "of the unique properties which they had purchased," and; that they were entitled to damages in the sum of $50,000. Their prayer was for a return of the $11,000 deposited with Romer and for damages in the amount of $50,000.

In the meantime Leyner had asked that a receiver be appointed and in response thereto Romer, on February 16, 1954, objected to the appointment of a receiver, alleging that Leyner had no interest in the Hotel property. Then it was that Leyner filed the amendment to his complaint mentioned above, wherein he also alleged that Romer had wrongfully kept him out of the property, that he was entitled to an accounting and that, because of the wrongful acts of Romer, he was entitled to special damages for attorney fees and expenses.

On March 5, 1954, Romer answered the cross-complaint of Dexter-Miller with a general denial and alleged that Dexter-Miller had full knowledge of the above mentioned Agreement when they entered into the contract of December 7th. By way of cross-complaint against Dexter-Miller she alleged that she had been defrauded into signing the December 7th contract and asked for damages in the amount of $50,000. To the above cross-complaint Dexter-Miller, on April 27, 1954, entered a general denial.

*Decree and findings of fact.* The issues above joined were submitted to the trial court on voluminous depositions and oral testimony and the court, on May 12, 1954, rendered its decree and, in response to a request by Leyner, made a detailed finding of facts. Each separate finding of the trial court will be set out below together with our separate conclusions thereon.

1. *Specific performance.* Leyner was decreed specific performance against Romer pursuant to the Agreement entered into on September 4, 1953, specifying the manner in which payments should be made by Leyner. It is unnecessary to discuss the testimony and arguments relating to this issue for the reason that Romer on June 9, 1954, tendered a performance of the court's decree, and Romer has not prosecuted an appeal from this part of the decree.

2. *Dexter-Miller.* The trial court found that Romer had agreed on December 7th to sell Dexter-Miller the property in question for [what amounted to] $455,500, that they were ready, able and willing on December 15th to perform, but that Romer had refused and was unable to perform.

(a) The court decreed that Romer was not entitled to any damages against Dexter-Miller because of the latter's alleged fraudulent conduct. The reason given by the trial court was that there was no evidence to support the claim. The decisions of the trial court in this respect and the reasons given therefor were correct.

(b) The trial court decreed that, by reason of Romer's conduct and failure to perform, Dexter-Miller were entitled to a judgment against Romer in the amount of $5,000 for attorney fees; $6,000 lost by Dexter-Miller in converting government bonds to raise money for the purchase price; $900 for travel expenses incidental to the lawsuit, and $11,275, being the amount plus interest deposited by Dexter-Miller when the December 7th contract was signed. There is no issue regarding the item of $11,275 as the record shows this amount has been repaid to Dexter-Miller.

It is our conclusion that the trial court was in error in allowing Dexter-Miller judgment for the other items mentioned above. Before setting out the reasons for our disagreement with the trial court, as indicated above, it is pertinent to refer to Dexter-Miller's cross-complaint against Romer in which they sought damages in the amount of $50,000.

It is not clear from the cross-complaint of Dexter-Miller what was intended to constitute damages in the amount asked for. It was alleged that they were denied the use "of the unique properties which they had purchased." From this statement we presume they meant the excess in value of the Hotel Court over the amount they agreed to pay, however the issue was not developed at the trial. We assume further that the trial court considered this element of damages as waived since the decree makes no mention of it. In spite of this, however, Dexter-Miller argue on cross-appeal that they are entitled to judgment for $44,500. This figure appears to be based on the fact that they agreed to pay $455,500 for the Hotel Court and that it was sold to Leyner for $500,000. In any event Dexter-Miller are not entitled to judgment in any amount in this connection because no evidence was introduced to show the market value of the Hotel Court and we cannot presume in the absence of other competent testimony that its market value was $500,000 simply because it was the price paid by Leyner. We might as well assume that the market value was the price which Dexter-Miller agreed to pay. Dexter-Miller made no effort to prove damages according to the rule well established by decisions of this court which we mention later.

*As to the special allowances mentioned above.* In a suit of this kind there is no provision under the statutes or decisions of this state to allow attorney fees or miscellaneous expenses as an element of damages. The measure of damages [assuming they had a cause of action and could prove it] to which Dexter-Miller were entitled as against Romer for her failure to perform the

contract of December 7th was the excess of the market price of the property over the price they agreed to pay.

The above stated rule was first announced in regard to the sale of personal property in *Ebenezer Hanna* v. *Henry Harter*, 2 Ark. 397. In answering the query as to what constituted the measure of damages for breach of contract to sell, the court, at pages 400-401, said:

"It certainly was the difference between the price agreed on between the parties, and the marketable price of the pork at the time of the delivery at the place fixed on by the agreement. And how should this difference be ascertained or computed? There is but one way by which it could be established. The plaintiff was bound to prove, by witnesses, what was the price of pork at the time for the delivery thereof at the place appointed; and the difference between that sum and the amount agreed to be paid by him, constituted the true damages that he was entitled to recover. This he failed to do, but proved, by a witness, that the defendant sold his pork at four dollars and fifty cents per hundred."

The above case was cited with approval, and the rule announced was applied to a breach of contract to sell real property in *Kempner* v. *Cohn*, 47 Ark. 519, 1 S. W. 869. There the owner, Kempner, breached his contract to sell, and the trial court allowed Cohn to prove damages resulting from loss of interest on money held ready to purchase and from having executed a lease on the property before the breach. In disallowing such items as damages this court, at page 527 of the Arkansas Reports, had this to say:

"These are not proper elements of damages, for two reasons: First. They are too remote, not flowing naturally from the wrong complained of, nor presumably within the contemplation of the parties; and, second: To allow them would be in effect to give double compensation for the same injury. In an action by a purchaser of land for breach of the contract to convey, the measure of damages is the difference between the contract price and the value of the land when the breach

occurred, with interest on such difference. To this the cases usually add the expense of investigating the title, when any expense has been incurred. The vendee is entitled to have the thing bargained for, whether it be land or chattels, at the price agreed upon, and to resell it himself at its market price. And when he has received the profit, which it is shown he could have made on a resale, he has been fully indemnified.''

Since, as noted above, there is no evidence to establish the market value of the Hotel Court, the rule just announced precludes Dexter-Miller from recovering the larger item of damages. Having failed in this, they are thereby precluded from recovering for attorney fees and expenses.

There are moreover numerous decisions of this court which lead us to conclude that it was error for the trial court to award damages for attorney fees and expenses. In instances where the issue and facts were similar to those under consideration this court has uniformly disallowed attorney fees and expenses as an element of damages incident to the prosecution or defense of a cause of action in the courts. See *Jacobson* v. *Poindexter,* 42 Ark. 97; *Boozer* v. *Anderson, et al.,* 42 Ark. 167; *Goodbar* v. *Lindsley,* 51 Ark. 380, 11 S. W. 577; *White River, Lonoke & Western Railway Company* v. *Star Ranch & Land Company,* 77 Ark. 128, 91 S. W. 14; *Evans* v. *Ozark Orchard Company,* 103 Ark. 212, 146 S. W. 511; *Arkansas National Bank* v. *Stuckey,* 121 Ark. 302, 181 S. W. 913; *Federal Land Bank of St. Louis* v. *Craig,* 176 Ark. 381, 3 S. W. 2d 34; *American Exchange Trust Company* v. *Trumann Special School District,* 183 Ark. 1041, 40 S. W. 2d 770; *Hardy* v. *Hardy,* 217 Ark. 305, 230 S. W. 2d 11.

In the *Jacobson* case, *supra,* it was said:

''The law makes no allowance to the successful suitor for his time, indirect loss, annoyance or counsel fees. It considers, in general, the taxed costs as the only damages which a party sustains by the defense or prosecution of a suit.''

In the *Goodbar* case, *supra,* the trial court allowed $75 for expenses in attending trial, and this court disapproved, saying:

"But it is on account of the attachment alone that a recovery can be had on the attachment bond. Expenses incurred by a defendant in attachment in prosecuting his own suit for damages must be borne by himself the same as expenses are borne by others who become actors in the courts to right their wrongs."

Unless attorney fees are allowed by statute, this court regards the allowance of such as in the nature of a penalty on litigation. In the *White River, Lonoke & Western Railway Company* case, *supra,* we said:

"Attorney's fees are not ordinarily held to be an element of damages which may be recovered for breaches of contract.

"Nor could the parties have had in mind the repayment of attorney's fees in a suit by the lessor against the lessee for the recovery of possession of the property at the end of the lease or upon default in payment of rent. This would be a penalty upon the right of the lessee to litigate."

It was said in *American Exchange Trust Company* case, *supra,* that:

"Attorney's fees cannot be allowed as costs in suits, except as provided by statute, the same being regarded as a provision for a penalty and not to be enforced in the State courts."

We find no statute and no authority in our decisions authorizing the special damages awarded to Dexter-Miller, and the trial court's decree in this respect must be reversed.

3. The trial court awarded Leyner a judgment for special damages against Romer in the amount of $6,000 for attorney fees and $1,855.43 for incidental expenses. For the reasons assigned above in connection with the disallowance of special damages in favor of Dexter-

Miller, it is our conclusion that the trial court was in error. Leyner is entitled to nothing for special damages.

4. The trial court, as a part of its decree, appointed a Master to state an account between Leyner and Romer, to examine the original books and records, to obtain testimony of witnesses and to compile an accounting of the operation of the Hotel Court since December 28, 1953, and to do other things incidental to consummating the decree of specific performance. It was stated by the court that the Master should not allow any compensation for management during said period of time. Romer has appealed from this portion of the decree, contending that since Mrs. Romer, individually, has served as manager and has performed many useful services she should be allowed compensation. We agree with this. Mrs. Romer should be allowed to introduce testimony before the Master to show the value of her services for the time indicated to the end that the court may award her suitable compensation or credit.

The decree of the trial court is therefore reversed in all respects as above indicated, otherwise it is affirmed.