In re Shannon D. SCOTT and Patricia R. Scott, d/b/a K.C. Audio/Video Center of Camden, Debtors.

The BANK OF YELLVILLE, Plaintiff/Counter–Defendant,

v.

Shannon D. SCOTT and Patricia R. Scott, d/b/a K.C. Audio/Video Center of Camden and Claude S. Hawkins, Jr., Trustee Defendants/Counter–Claimants,

and

Borg–Warner Acceptance Corporation, Intervenor/Plaintiff,

and

ITT Commercial Finance Corporation, Defendant.

Bankruptcy No. ED 87–177M.

United States Bankruptcy Court, W.D. Arkansas, El Dorado Division.

Jan. 17, 1990.

Claude S. Hawkins, Jr., Ashdown, Ark., trustee.

Robert L. Depper, Jr., El Dorado, Ark., for the trustee.

Frank H. Bailey, Mountain Home, Ark., for Bank of Yellville.

Phillip Pesek, Little Rock, Ark., for TransAmerica (Borg–Warner).

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

On November 10, 1987, The Bank of Yellville, Arkansas (Bank) filed a complaint for foreclosure in the Chancery Court of Ouachita County, Arkansas, (No. 87–377) against Shannon D. Scott and his wife, Patricia R. Scott d/b/a K/C Audio/Video Center of Camden. On November 18, 1987, Borg–Warner Acceptance Corporation of Arkansas [1] (Borg–Warner) intervened in the foreclosure action claiming a security interest in the same property which was subject to the foreclosure action. On November 25, 1987, Shannon and Patricia Scott filed a counterclaim against the Bank for damages allegedly resulting from the improper issuance of a prejudgment writ of attachment. On November 27, 1987, Shannon and Patricia Scott (debtors) filed a voluntary petition for relief under the provisions of chapter 7 of the United States Bankruptcy Code. On February 1, 1988, the Bank removed the state court action to the Bankruptcy Court.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K) and (O), and the Court has jurisdiction to enter a final judgment. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

The parties have presented two issues to be determined: whether Borg–Warner or the Bank has a first lien on $24,947.66 of

---

1. Borg–Warner is now known as Transamerica Commercial Finance Corporation.

inventory;[2] and whether the Bank is liable for damages resulting from the issuance and execution of a wrongful attachment.

# I

## LIEN PRIORITIES

The debtors purchased an audio/video business located in Camden, Arkansas, in June 1985. The assets of the business, including inventory, were purchased by the debtors in their individual capacities. As part of the purchase, the debtors obtained the right to continue to use the trade name of "KC Audio Video Center of Camden." To finance the purchase of the business, the debtors borrowed the sum of $185,-000.00 from the Bank and executed a note to the Bank dated June 13, 1985. The note identified "Shannon D. Scott" and "Patricia R. Scott" as the borrowers and was executed by them in their individual capacities. To secure repayment of the note, the debtors executed a security agreement and financing statement dated June 13, 1985, granting to the Bank a security interest in all inventory, accounts receivable, machinery, equipment, furniture, and fixtures "now owned or hereafter acquired for use in Debtor's business as now conducted or hereafter to be conducted." The financing statement identified the debtors as "Shannon D. Scott or Patricia R. Scott DBA K/C Audio/Video Center of Camden," and was signed by "Shannon D. Scott" and "Patricia R. Scott," individually. The financing statement was properly filed with the Secretary of State of Arkansas and the Ouachita County Circuit Clerk on June 20, 1985, and August 8, 1985, respectively. The debtors also executed an inventory security agreement which identified the borrowers as "Shannon D. Scott and Patricia R. Scott d/b/a K/C Audio/Video Center of Camden." The inventory security agreement was signed "Shannon D. Scott" and "Patricia R. Scott."

On July 12, 1985, on the advice of their accountant, the debtors formed a corporation in which to conduct their business.

The corporation was named "KC of Camden, Inc." Shannon Scott testified that all of the debtors' assets used in the business were transferred to the corporation. All but one share of the stock in the new corporation was issued to Shannon and Patricia Scott.

On July 17, 1985, Shannon Scott, as president of "K.C. of Camden, Inc.," executed a security agreement in favor of Borg–Warner granting a security interest in all inventory "now or hereafter owned" by the corporation. A financing statement in the name of "K.C. of Camden, Inc." was executed by Shannon Scott and Patricia Scott, on behalf of K.C. of Camden, Inc., and was properly filed of record with the Secretary of State of Arkansas and the Ouachita County Circuit Clerk on August 26, 1985, and August 27, 1985, respectively. The transaction between KC of Camden, Inc., and Borg–Warner was characterized by the parties as a floor plan arrangement, and Borg–Warner loaned the money to purchase relatively expensive items of inventory, such as stereo equipment, which were capable of specific identification through individual serial numbers. According to Shannon Scott, all of the inventory in which Borg–Warner claims a security interest was purchased with the loan proceeds from Borg–Warner and not with the proceeds from the sale of any preincorporation inventory in which the Bank claims a security interest.

The Bank did not become aware of the existence of the corporation until sometime in 1986 when financial information was submitted which made reference to the corporation. Charles Campbell, who became employed at the Bank in February 1987, testified that he was not alarmed when he learned that the business was being conducted in a corporate form because he felt the creation of the corporation was merely a name change. The Bank took no steps to obtain a new security agreement from the

---

**2.** The inventory was liquidated and reduced to a cash sum of $24,947.66 which Borg–Warner holds pending a determination of this litigation.

corporation or file a new financing statement in the name of the corporation.[3]

The Bank argues that its security interest extends not only to the property transferred to the corporation by the Scotts, but also to the inventory later acquired by the corporation with the proceeds of the Borg–Warner loan. Borg–Warner claims a security interest only in the inventory acquired by the corporation after its incorporation. Borg–Warner argues that the Bank has no security interest in this inventory for two reasons: first, the corporation never granted a security interest to the Bank in any of its property; and, second, even if the Bank were deemed to possess a security interest in the inventory acquired by the corporation, the security interest would not be perfected because the name on the Bank's financing statement is seriously misleading and is not sufficient notice of a claim of a security interest in property owned by KC of Camden, Inc.

The 1962 version of the Uniform Commercial Code did not deal specifically with the viability of a financing statement in situations where the debtor, postfiling, changed its name or business structure or transferred collateral to another. A uniform amendment, prepared by the Article 9 Review Committee in 1972 and adopted in Arkansas in 1973, sought to address the problem. Ark.Code Ann. § 4–9–402(7), as amended in 1973, provides as follows:

> A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership, or corporate name of the debtor, whether or not it adds other trade names or names of partners. Where the debtor so changes his name or in the case of an organization, its name, identity, or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four (4) months after the change, unless a new appropriate financing statement is filed before the expiration of that

time. A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.

The language of the amended section 9–402(7) has been criticized as being ambiguous. *See* Burke, *The Duty to Refile Under Section 9–402(7) of the Revised Article 9*, 35 Bus. Law. 1083 (1980). The official comments to section 9–402(7) state, in part, as follows:

> [T]he principle sought to be achieved by the subsection is that after a change which would be seriously misleading, the old financing statement is not effective as to new collateral acquired more than four months after the change, unless a new appropriate financing statement is filed before the expiration of the four months. The old financing statement, if legally still valid under the circumstances, would continue to protect collateral acquired before the change and, if still operative under the particular circumstances, would also protect collateral acquired within the four months. Obviously, the subsection does not undertake to state whether the old security agreement continues to operate between the secured party and the party surviving the corporate change of the debtor.

One commentator's analysis described the section as follows:

> These two [the second and third] sentences address different issues and state different rules. The [second] refers to name changes and, for business organizations, changes in name, identity and corporate structure. The [third] sentence applies to transfers of collateral. . . .
>
> The basic import of each sentence is clear. According to the [second] sentence, if a name change or change in identity renders the financing statement seriously misleading, the filed financing statement (under the debtor's old name and now misleading) continues to perfect

---

**3.** *See* Ark.Code Ann. § 4–9–402(2)(d) (1987), which purports to permit a secured party to file an effective financing statement without the debtor's signature to cover collateral acquired after a change of name or corporate structure.

the creditor's interest in all collateral the debtor has or acquires within four months after the change. It is not effective to perfect a security interest in collateral the debtor acquires more than four months after the change. To maintain perfection regarding collateral the debtor acquires more than four months after the name change, the secured party must file a new, appropriate financing statement to reflect the change.

1 U.C.C. Serv. (MB) § 6.10[4], at 6–208 to –209 (1989) (footnotes omitted).

Under the facts present here, the debtors were conducting a business in their individual capacities, then created a corporation and transferred all of their business assets to the new entity. The new entity subsequently acquired inventory in its own name with the proceeds of a new loan from Borg–Warner. The loan proceeds were given, not to the individuals, but to the corporation, which in turn granted Borg–Warner a security interest in the new inventory. Borg–Warner properly perfected its security interest. No evidence of fraud or bad faith by any party was alleged or shown by the evidence, and Borg–Warner had no knowledge of the existence of the Bank's prior claim of a security interest.

■ Application of section 9–402(7) to property acquired by the corporation under these facts is difficult because a security interest cannot be created under Article 9 unless the debtor has signed a security agreement in favor of the secured party, value has been given and the debtor has rights in the collateral. *See* Ark.Code Ann. § 4–9–203(1)(a)–(c); *Findley Machinery Co. v. Miller*, 3 Ark.App. 264, 268, 625 S.W.2d 542, 544 (1981). A security interest in inventory is perfected when a valid financing statement, signed by the debtor, is properly filed. *See* Ark.Code Ann. §§ 4–9–302, 4–9–401, 4–9–402. In this case no security agreement was executed by the

corporation in favor of the Bank and no value was extended by the Bank to the corporation. Although the last sentence of section 4–9–402(7) permits the continued perfection of a security interest in collateral which is transferred to a new entity, new property acquired by the transferee corporation is, by definition, not collateral transferred by the debtor. Whether or not a financing statement is misleading so as to render a filing ineffective would appear to be legally irrelevant if there is no underlying security interest to perfect.

The author of one article acknowledges that it is technically impossible for section 9–402(7) to be construed to extend the security interest of a creditor to a transferee corporation's new inventory because of the absence of a security agreement. Knippenberg, *Debtor Name Changes and Collateral Transfers Under 9–402(7): Drafting from the Outside–In*, 52 Mo.L.Rev. 57, 106 (1987). *See also* Burke, *supra*, at 1094. Courts, however, have construed section 9–402(7) to extend to after-acquired property of the newly formed corporation in situations similar, if not identical, to the facts in this case.

Some cases have focused on whether the new entity's name was seriously misleading, and others have focused on whether the new entity was owned and controlled by the same individuals operating the old entity.[4] Some cases have specifically held that the secured creditor remained perfected as to property acquired by the new entity, while others have failed to address the distinction between property transferred to the new entity upon the corporate structure change and property subsequently acquired by the new entity.

For example, in *Towers v. B.J. Holmes Sales Co. (In re West Coast Food Sales, Inc.)*, 637 F.2d 707 (9th Cir.1981), the court held that a security agreement executed by a sole proprietorship continued to be effec-

**4.** One commentator who is critical of this construction argues that the basis for such decisions is an alter ego theory:

Many of the ... transfers of collateral cases seem to proceed upon the unstated premise that when collateral is transferred to a corporation that continues to be owned and operat-

ed by the same persons who controlled the transferor, the corporate identity may be disregarded and the case may be treated as though no transfer had occurred and only a name change is involved.

Burke, *supra*, at 1092.

tive as to accounts receivable generated after the business incorporated. After noting other cases upholding a security interest in after-acquired property of a transferee debtor, the court abruptly concluded that the security interest must be recognized or else "a debtor would be able to evade the obligations of a validly executed security agreement by the simple expedient of an alteration in its business structure." *Id.* at 709.

In *Houchen v. First Nat'l Bank of Pana (In re Taylorville Eisner Agency, Inc.),* 445 F.Supp. 665 (S.D.Ill.1977), the court held that a creditor with a security interest in after-acquired property of a sole proprietorship remained perfected as to collateral transferred to a corporation formed by the business's owners, as well as property acquired by the corporation following the change. The court held that the "collateral" transferred encompassed after-acquired property but did not address the separate identity of the new entity acquiring the property.

In *Bank of the West v. Commercial Credit Financial Services, Inc.,* 852 F.2d 1162 (9th Cir.1988), a parent corporation transferred one of its businesses from one of its wholly owned subsidiaries to another. Two creditors claimed an interest in the accounts generated from the sale of the business's inventory after the transfer. The court held that the first secured creditor, which held a security interest in the transferor subsidiary's after-acquired accounts, remained perfected as to accounts actually transferred and as to accounts subsequently generated by the transferee subsidiary. The court equated the transfer to a change in corporate structure that was governed by the second sentence of section 9–402(7). The court chose not to read section 9–402(7) rigidly and stated that the last sentence only applied to "bona fide transfers of collateral to third parties unrelated to the transferor," unlike the fact situation at hand. *Id.* at 1169–70 n. 6.

In *Crocker Nat'l Bank v. Clark Equip. Credit Corp.,* 724 F.2d 696 (8th Cir.1984), the court held that a creditor's security interest in after-acquired inventory re-

mained perfected following the reorganization of a business into a new corporation and the transfer of its assets. The court stated that the new corporation had agreed that the old corporation's creditors would retain their priority in property transferred and that the transfer amounted to a name change that was not misleading.

In *Lieberman Music Co. v. Hagen,* 2 U.C.C. Rep. Serv.2d (Callaghan) 718, 394 N.W.2d 837 (Minn.Ct.App.1986), the court held that a change in an organization from a sole proprietorship to a corporation did not render a financing statement misleading.

Even before section 9–402(7) was amended, courts used various theories to extend the creditor's security interest to property acquired after a change or transfer. *See, e.g., Corwin v. RCA Corp. (In re Kittyhawk Television Corp.),* 516 F.2d 24 (6th Cir.1975) (transfer of assets between related corporate entities treated as a name change which was not misleading); *Ryan v. Rolland,* 434 F.2d 353 (10th Cir.1970) (following unauthorized transfer to corporation, creditor was not obligated to file a new financing statement to retain perfected security interest in present and after-acquired property); *In re Darling Lumber, Inc.,* 56 B.R. 669 (Bankr.E.D.Mich.1986) (incorporation of sole proprietorship was not seriously misleading change); *Avdoyan v. Sun Bank at Pine Hills (In re Sofa Centre, Inc.),* 18 U.C.C. Rep.Serv. (Callaghan) 536 (Bankr.M.D.Fla.1975) (transfer of assets from partnership to corporation treated as name change which was not misleading); *King v. Williams (In re Conger Printing Co.),* 18 U.C.C. Rep. Serv. (Callaghan) 224 (D.Or.1975) (after incorporation and transfer of collateral to the corporation, corporation bound by "successors and assigns" clause); *Fliegel v. Associates Capital Co. of Delaware,* 17 U.C.C. Rep. Serv. (Callaghan) 850, 272 Or. 434, 537 P.2d 1144 (1975) (partnership's security interest extended to inventory acquired by new corporation because of section 9–306(2) and the clause in the security agreement binding successors and assigns); *Borg–Warner Acceptance Corp. v. Bank of Marin,* 13 U.C.C. Rep.Serv. (Callaghan) 939, 36 Cal.

App.3d 286, 111 Cal.Rptr. 361 (Cal.Ct.App. 1973) (transfer of assets from partnership to corporation treated as name change which was not misleading).

At least one case has attempted to reconcile the various provisions of the Uniform Commercial Code. In *Citizens Sav. Bank v. Sac City State Bank*, 33 U.C.C. Rep. Serv. (Callaghan) 98, 315 N.W.2d 20 (Iowa 1982), two banks claimed priority in the distribution of the liquidated assets of an auto dealership which changed its structure from a sole proprietorship to a corporation. The court held that the bank which had received a security agreement covering after-acquired property from the sole proprietorship did not have a perfected security interest in property acquired by the corporation for three reasons. First, the court stated that the incorporation created a distinct and different entity and was more than a mere name change. Second, the court stated that, for section 9–402(7) to apply, the debtor acquiring new collateral must be the same debtor which underwent a change, which was not the case since the sole proprietorship underwent a change and the new corporation acquired the new property. Finally, the court stated that the corporation could not be bound because it never granted a security interest to the bank or signed a financing statement as required by the Uniform Commercial Code.

In *In re Edwards Equip. Co.*, 46 B.R. 689 (Bankr.W.D.Okla.1985), the court stated in dicta that, if an original financing statement was executed by the debtor as a sole proprietorship and was subsequently amended to reflect the debtor's change to a corporation, the court doubted that a continuation statement referring to the amendment would continue to perfect the creditor's security interest in collateral listed only on the original financing statement. In *In re Meyer–Midway, Inc.*, 65 B.R. 437

(Bankr.N.D.Ill.1986), two businesses granted security interests to a bank in their accounts receivable, then merged to form a new corporation. The court held that the bank remained perfected as to accounts receivable existing at the time of the merger, but not as to accounts receivable generated more than four months after the merger. The court stated it could not "infect" with perfection the property later acquired by the successor entity. *Id.* at 444.

Most of the cases which validate the existing security interest in the after-acquired collateral of the transferee appear to disregard the fact that the transferee is a separate entity which has not granted a security interest to the transferor's creditor. The transferee is typically owned by the former debtors. One commentator argues that the security interest in the transferee's after-acquired property ought to be validated under this so-called alter ego theory because this interpretation of section 9–402(7) produces a better result even though it requires the law to indulge in a legal fiction.[5]

While no satisfactory resolution of this issue may exist, the language of section 9–402(7) cannot properly be construed to dispense with the specific requirements of section 9–203(1) because, as Burke points out, section 9–402(7) "assumes the existence of a security interest to perfect." Burke, *supra*, at 1094. Nor can the requirements of section 9–203(1) be met by employing a legal fiction that the new corporation is not a separate entity. Under state law, a corporate entity may be disregarded in appropriate circumstances, but here no allegation was made that the corporate entity should be disregarded and no facts warranting such action were shown. To require a searcher to determine to what extent a debtor entity is owned or controlled by owners of the transferor debtor

---

5. The commentator stated:

[I]t would be more consistent with the Code's aim to give filers certainty. In addition, changes in business form seem more analogous to name changes. If a debtor changes his name, the creditor continues to deal with the same person. So too, if the debtor incorporates, although his legal form has changed,

the ultimate players remain the same.... Although at law, each entity is an entity unto itself and recognized at law, we all know the law indulges in legal fictions. If the creditor is still talking to, working with and loaning money to the same people, isn't the change in business form like a change in name?

1 U.C.C. Serv. (MB) § 6.10[5], at 6–218.

would render the filing system of Article 9 unreliable. The potential structural variations of the new debtor are infinite.[6]

The Bank's claim of a security interest in the corporation's new inventory is, therefore, not sustainable because K.C. of Camden, Inc., has not executed a security agreement in favor of the Bank. *See Citizens Sav. Bank v. Sac. City State Bank*, 33 U.C.C. Rep.Serv. (Callaghan) at 107, 315 N.W.2d at 27–28. It is unnecessary to consider the alternative issue argued by the parties of whether the Bank's financing statement was seriously misleading. Borg–Warner is determined to have a valid first lien in the proceeds from the sale of the inventory in question.[7]

## II

### WRONGFUL ATTACHMENT

The facts regarding the issue of wrongful attachment are as follows. The debtors' loan had been delinquent during 1987, and the debtors and Charles Campbell, president of the Bank, had agreed on a payment schedule to bring the arrearage current. In October 1987, Campbell had been trying unsuccessfully to contact Shannon Scott by telephone. Because of Campbell's inability to reach the debtors to discuss the problems with the loan, Campbell sent a letter dated October 15, 1987, by certified mail, demanding that the note be brought current by November 6 or the Bank would be required to take action to collect the note. The letter was returned unclaimed. The Bank assumed it had a security interest in the inventory of the debtors' business which included videocassette tapes which the debtors sold or rented to customers in the ordinary course of business. Campbell testified that in November 1987 he had knowledge that the debtors' business was being conducted, which meant that items of inventory in which the Bank had a security interest were being sold or rented, and that the Bank had received no payment for four months. Based on these circumstances and because Campbell had been unable to contact the debtors to ascertain the disposition of its collateral, the Bank, on November 10, 1987, filed its complaint for foreclosure against the debtors. Campbell, on behalf of the Bank, also executed an affidavit for a prejudgment writ of attachment which stated in part as follows:

That the Defendants are about to remove or have removed their property, or a material part thereof, out of this state, not leaving enough therein to satisfy the Plaintiff's claim; or have sold, conveyed or otherwise disposed of their property with the fraudulent intent to cheat, hinder or delay their creditors, or the defendants are about to sell, convey or otherwise dispose of their property with such intent.

---

**6.** As Burke stated:

> If transfers are disregarded because of the management or ownership similarities of the transferor and the transferee, it will never be possible to determine how much change in ownership, control or business activity will result in recognition of the separate legal status of the transferee for purposes of creating and perfecting a security interest in the assets of the transferee. It is apparent that alter ego as a refiling theory is incompatible with the purpose of the filing rules of article 9 since it will not produce uniform filing or search rules that can be safely relied upon in structuring secured transactions.

Burke, *supra,* at 1092.

**7.** The result reached here is consistent with Burke's view:

> With respect to new property acquired by the transferee, the secured creditor must establish both the existence of security interest in the property and perfection of the security interest. Assuming that the secured creditor can establish the existence of a security interest in the property acquired by the transferee, the last sentence of section 9–402(7) clearly does not operate to perfect the security interest. The new property acquired by the transferee is by definition not "collateral transferred by the debtor," within the meaning of the last sentence of section 9–402(7); and a financing statement filed in the name of the transferor can not perfect a security interest in property acquired by the transferee. *As to new property acquired by the transferee after the transfer, the secured creditor should obtain a new security agreement signed by the transferee and file a new financing statement signed by the transferee.*

Burke, *supra,* at 1100 (emphasis added) (footnotes omitted).

After an ex parte hearing before the chancellor on the same day, an order of attachment was issued directing the sheriff of Ouachita County to "attach and safely keep property of the defendant in this county not exempt from execution, or so much thereof as will satisfy the plaintiff's claim of $183,718.17."

A deputy sheriff, counsel for the Bank, Campbell and another bank employee then went to the debtors' place of business where the deputy sheriff executed the writ. The deputy sheriff testified that when he executed the writ "everything was peaceable" and that Shannon Scott went out to his truck, got the keys to the business premises and delivered them to the deputy sheriff. Record at 124. The deputy sheriff and Campbell testified that neither of them made a demand for the keys from Shannon Scott and that Shannon Scott surrendered the keys voluntarily. Campbell said, "There was conversation about we're going to have to do something with this stuff, and Mr. Scott said, I'll just give you the keys." Record at 95. Shannon Scott testified that counsel for the Bank advised him that "they would need the keys to [his] building to secure the collateral." Record at 242. Shannon Scott then surrendered the premises to the Bank and departed. The debtors filed this chapter 7 petition a few days later.

The debtors argue that the Bank had no basis for the issuance of the writ of attachment, that the Bank improperly attached property which was not subject to the Bank's security interest and that the effect of the wrongful attachment was to force the debtor out of business. In their coun-

terclaim against the Bank, the debtors claimed compensatory damages of $500,-000.00 [8] and punitive damages of $1,000,-000.00.

■ A creditor may be entitled to the issuance of a writ of attachment against property of a debtor if the debtor "[i]s about to remove, or has removed, his property, or a material part thereof, out of this state, not leaving enough therein to satisfy the plaintiff's claim, or ... [h]as sold, conveyed, or otherwise disposed of his property, or suffered or permitted it to be sold, with the fraudulent intent to cheat, hinder, or delay his creditors; or, ... [i]s about to sell, convey, or otherwise dispose of his property, with such intent." Ark.Code Ann. § 16–110–101 (1987). Disposing of property to pay debts and applying the proceeds thereto in the usual course of business is not fraudulent within the meaning of the statute. *Arkansas Nat'l Bank v. Stuckey,* 121 Ark. 302, 309–10, 181 S.W. 913, 916 (1915); *Blakemore v. Eagle,* 73 Ark. 477, 480, 84 S.W. 637, 638 (1905). If the creditor can establish that the property was being sold with the fraudulent purpose of placing the cash proceeds beyond the reach of creditors, sufficient grounds would exist under the statute for a writ of attachment. *Hackworth v. First Nat'l Bank of Crossett,* 265 Ark. 668, 675–76, 580 S.W.2d 465, 469–70 (1979); *Arkansas Nat'l Bank v. Stuckey,* 121 Ark. at 309–10, 181 S.W. at 916.

On cross-examination, Campbell testified as follows:

Q: ... Continuing on in that particular paragraph, sir, you say the Plaintiff believes that the Defendants are

---

8. The debtors' post-trial brief adjusts the amount of compensatory damages to $417,-585.08, based on the value of the assets of the business at the time of attachment and Shannon Scott's lost wages, as follows:

| | |
|---|---|
| Accounts Receivable | $ 8,914.92 |
| Inventory Audio | 75,370.64 |
| Inventory Video | 71,494.37 |
| Inventory Repairs | 4,153.69 |
| Inventory Supplies | 3,793.74 |
| Fixtures & Equipment | 30,074.66 |
| Rental Equipment | 664.59 |
| Movie Rentals | 98,266.94 |
| Trade Name | 26,551.23 |
| Purchase New Assets | 7,300.30 |
| Total Value of Assets | $326,585.08 |

| | |
|---|---|
| Five Years of Lost Wages at $350.00/week | 91,000.00 |
| Total | $417,585.08 |

However, Shannon Scott testified that the Bank only had a lien on approximately 30% of the business assets. The record is silent regarding the ultimate disposition of the Bank's collateral except for Borg–Warner's collateral. Furthermore, Shannon Scott testified that he acquired new employment subsequent to his bankruptcy and at the time of the hearing was earning more than he had made from his business prepetition.

about to remove, or have the property removed, or—yeah, or have removed the property, or a material part thereof, out of this state. You didn't have any knowledge that those items were going to be moved out of this state, did you, Mr. Campbell?

A: I have already testified that I had no knowledge, and nobody had called me up and said this collateral was moved out of the state.

Q: Yes, sir. You continue to say in that paragraph, that you believe the property was about to be conveyed or otherwise disposed of, or disposed of their property with a fraudulent intent to cheat, hinder or delay their creditors. You didn't have any knowledge, Mr. Campbell, that, in fact, Mr. Scott was trying to cheat you, did you, sir?

A: Yes, sir, I did.

Q: And I presume that you're going to tell us that the basis for your belief that he was about to cheat you, was the fact that you hadn't been paid, is that correct?

A: That's exactly right.

Q: But, other than that, ...

A: That's the most important thing in a promise to pay, that

Q: I understand that ...

A: ... that you either be paid in full, or you be in the process of receiving payments periodically.

Q: But you don't ...

A: I wasn't getting either.

Q: Fair enough. But you don't know exactly why you weren't paid, do you, sir?

A: At that time?

Q: Yes, sir.

A: I did not know, no.

Q: That's correct. So, for all you knew, there could have been a reasonable explanation for your [not] being paid, other than someone trying to cheat you, isn't that possible?

A: That is possible.

Q: Yes, sir. You continue to say in that particular paragraph, sir, that Mr. Scott was about to convey or otherwise, continuing on the second page, dispose of the property with such intent, and I guess that such intent was to cheat, hinder or delay. Other than your not getting payment, you had no other indication of Mr. Scott trying to cheat, hinder or delay you, is that correct?

A: No, sir.

Q: That is not correct?

A: No, sir, I had no other indication, other than the fact he was not paying me; he was not willing to discuss with me why he wasn't paying me; he was not telling me his plan for which—through which he could pay me, or he could catch up.

Record at 87–89.

The conclusions in the Bank's affidavit were not warranted by the facts Campbell possessed and the writ of attachment should not have been issued. Nevertheless, the debtors have not established their entitlement to any compensatory or punitive damages.

■■■ Shannon Scott admitted that, except for the Borg–Warner inventory and some inventory floor planned by another creditor, everything in the store was either inventory, fixtures or accounts receivable which existed at the time the Bank's security interest attached or was the proceeds from such collateral. When the debtors conveyed their property to the corporation, the Bank's security interest in the property or the proceeds from the sale of the property was not affected because the property was not conveyed to a buyer in the ordinary course of business. *See* Ark.Code Ann. § 4–9–307 (Supp.1987). Under these facts, the security interest in favor of the Bank remained, notwithstanding the fact that the property was now owned by a new entity, a corporation. *See* Ark.Code Ann. §§ 4–9–306, 4–9–402(7) (1987). Although some minor items of the debtors' personal property were seized under the writ of attachment, the debtors were later allowed

to reclaim the items without any significant inconvenience, and no evidence was presented of any damage resulting from the seizure.

A creditor which holds a consensual lien in real or personal property securing an indebtedness has a cause of action to foreclose the lien if the debtor commits an act of default such as failure to make a timely payment on the indebtedness. *See* Ark. Code Ann. § 4–9–501. A secured party has a variety of remedies available, including the remedies provided in the security agreement (Ark.Code Ann. § 4–9–501(1)) and a right to take immediate possession of the collateral without judicial process (Ark. Code Ann. § 4–9–503). Alternatively, the secured party may file a petition for an order of delivery (Ark.Code Ann. § 18–60–804 to –808) or a petition for a writ of replevin (Ark.Code Ann. § 18–60–809 to –822). *See McIlroy Bank & Trust v. Seven Day Builders of Arkansas, Inc.*, 1 Ark.App. 121, 131–32, 613 S.W.2d 837, 841–42 (1981).

The utilization of a writ of attachment to foreclose an existing consensual lien would seem to be superfluous since typically a writ of attachment is a remedy designed to create a prejudgment lien in favor of an unsecured creditor. Because of the debtors' default, the Bank already possessed a lawful right to possession of its collateral albeit through more appropriate remedies under Arkansas law. *See Goodbar v. Lindsley*, 51 Ark. 380, 383, 11 S.W. 577, 578 (1888). Therefore, the writ of attachment, even though wrongfully obtained, did not cause the debtors any damage. Furthermore, the fact that the Bank may have attached the corporation's property which was encumbered by a lien in favor of Borg–Warner does not entitle the debtors, Shannon and Patricia Scott, to an award of damages. If damages resulted from such a wrongful attachment, then a cause of action would exist in favor of the corporation which is not a party to this suit.

The evidence regarding the surrender of the leased premises also fails to establish any right to damages. The Bank had no right to seize the leased premises from the debtors because it had no security interest in the lease. However, the entity which was operating the business in the leased premises was the corporation and not the individuals. Significantly, neither the debtors nor the corporation, as far as the record shows, ever attempted to regain possession of the premises. The evidence suggests that the premises were surrendered voluntarily so that the Bank's collateral could be safely kept.

The events which occurred on November 10, 1987, were a predictable result of the debtors' default on their secured obligation to the Bank. However, since the evidence established that the Bank had no factual basis for the issuance of the writ of attachment and could have obtained possession of its collateral through other more appropriate remedies, the Court will enter judgment for the debtors on their counterclaim and award nominal damages in the sum of $1.00. *See Goodbar v. Lindsley*, 51 Ark. at 383, 11 S.W. at 578.

## III

### CONCLUSION

In summary, Borg–Warner is determined to possess a first lien in the proceeds of the liquidated collateral totaling $24,947.66. Borg–Warner's lien is determined to be the only lien against these proceeds. Further, the debtors are entitled to judgment against the Bank on the debtors' counterclaim and are awarded nominal damages of $1.00. A separate judgment will be entered pursuant to Bankruptcy Rule 9021.

IT IS SO ORDERED.