In re HOT SHOTS BURGERS & FRIES, INC., Debtor.

M. Randy RICE, Trustee, Plaintiff,

v.

FAS FAX CORPORATION, Crown Leasing, Inc., Supreme Fixture Company, Inc., JEH Leasing Corp., Asher Restaurant Equipment Sales & Service, Inc., Twin City Bank, Union Bank of Benton, and Wheelees, Inc., Defendants.

Bankruptcy No. 91–41298M.
Adv. No. 92–4130M.

United States Bankruptcy Court,
E.D. Arkansas,
Western Division.

March 23, 1994.

Abraham W. Bogoslavsky, Little Rock, AR, for Twin City Bank.

Randy M. Rice, Trustee for the debtor, Little Rock, AR.

Floyd A. Healy, Little Rock, AR, for Union Bank of Benton.

W. Frank Morledge, Forrest City, AR, for Wheelees, Inc.

Charles W. Baker, Little Rock, AR, for trustee.

Scott T. Vaughn, N. Little Rock, AR, for Union Bank of Benton.

Ron L. Goodman, Little Rock, AR, for debtor.

## MEMORANDUM OPINION

JAMES G. MIXON, Chief Judge.

On May 28, 1991, Hot Shots Burgers & Fries, Inc., (debtor) filed a voluntary petition for relief under the provisions of Chapter 11 of the United States Bankruptcy Code. The case was converted to a proceeding under Chapter 7 and M. Randy Rice was appointed trustee.

On November 5, 1991, the trustee, pursuant to court order, sold certain property that was scheduled as property of the estate. The property sold was as follows:

Personal property located at debtor's business at Geyer Springs and the debtor's warehouse at 12th and Battery Streets, Little Rock, Arkansas—Total sale price $6,325.00.

Personal property located at debtor's place of business in Bryant, Saline County, Arkansas—Total sale price $7,492.00.

Certain real property and a modular building located in Bryant, Saline County, Arkansas—Total sale price $160,000.00.

The bankruptcy petition filed by the debtor lists certain personal property used in the debtor's business and although the type of equipment is similar to that sold by the trustee, the itemization is different. The debtor's schedule of real property contains the following:

| | |
|---|---|
| 2.7 acres in Bryant, AR | $160,000.00 |
| Lot for Geyer Springs location, Little Rock, AR | 51,910.00 |
| Lot for warehouse location 12th and Battery | 27,766.50 |

On August 21, 1992, the trustee filed a complaint seeking a determination as to the correct distribution of the sale proceeds stated herein. The trustee alleged that the following is the correct distribution:

Net proceeds ($3,332.10) from sale of personal property on Geyer Springs to Twin City Bank.

Net proceeds from sale of personal property located at Bryant, Saline County, Arkansas ($7,492.00) to Union Bank of Benton.

Distribution of sale of real property and modular building in Bryant, Saline County, Arkansas, $135,000.00 to Union Bank of Benton and $25,000.00 from sale of modular building to be unencumbered property of the estate.

The three defendants who filed answers to the complaint are Wheelees, Inc., (Wheelees), Twin City Bank (Twin City), and Union Bank of Benton (Union Bank).

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K) (1988), and the Court has jurisdiction to enter a final judgment in the case. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Rule of Bankruptcy Procedure 7052.

### PROCEEDS FROM SALE OF PERSONAL PROPERTY IN GEYER SPRINGS, ARKANSAS

No creditor disputes the trustee's allegation that the proceeds from the sale of the personal property located at the Geyer Springs, Arkansas, location should go to Twin City. Therefore, the trustee is directed to pay to Twin City the sum of $3,332.10, less the trustee's attorney fees and costs of $620.00.

### PROCEEDS FROM SALE OF MODULAR BUILDING IN BRYANT, ARKANSAS

Union Bank, Wheelees, Twin City, and the trustee all claim an interest in the proceeds from the sale of the modular building located in Bryant, Arkansas. Union Bank contends that the modular building is real property subject to its mortgage lien and that its mortgage lien is superior to a purported security interest held by Wheelees. Wheelees claims that the debtor corporation had no interest in the collateral sufficient to grant a lien in favor of Union Bank and argues that the modular building is personal property owned by Edward A. Salazar, Luis E. Salazar and Thomas J. Houlihan, individually. Wheelees claims it holds a properly perfected security interest in the proceeds. Twin City argues that the modular building is personal property of the debtor and that its security interest is superior to the claims by Union Bank because Twin City's lien was filed first and superior to Wheelees' claim because Wheelees' claim of a security interest is unperfected. The trustee asserts that the modular building is personal property and that no creditor holds a properly perfected security interest in the building. Therefore, the trustee asserts that under the provisions of 11 U.S.C. § 544 the estate takes title to the proceeds free and clear of the various claims of liens.

### Discussion

The debtor was a closely-held corporation that was engaged in the "fast food" business beginning in 1986. The debtor was operated by Edward Salazar, Luis Salazar, and Thomas Houlihan (collectively "the individuals"), although the stock in the corporation was owned by their wives. The modular building in question was originally purchased by Wheelees from Mobi International in Forrest City, Arkansas. Wheelees used the modular building in the operation of a fast food restaurant in Forrest City under the name Wheelees.

The modular building was sold by Wheelees in April 1989 for the sum of $50,000.00. The evidence concerning the sale is confusing because sometimes the transaction appears to be between Wheelees and Edward Salazar, Luis Salazar and Thomas Houlihan, and other times between Wheelees and the debtor corporation, Hot Shots. For example, the modular building was sold by Wheelees for the total sum of $50,000.00. Wheelees received $10,000.00 in cash at the time of the sale. Edward Salazar testified regarding the down payment as follows:

Q: ... Can you testify positively as to who paid the ten down?

A: No, not positively.

Q: Could it have been that one of you individually, such as your father, paid the ten down?

A: I would think he probably did—yeah.

Record at 67.

Wheelees executed a bill of sale conveying the modular building to Edward A. Salazar, Luis E. Salazar, and Thomas J. Houlihan, individually. The $40,000.00 balance was to be paid according to the terms of a promissory note payable to Wheelees and executed by Edward A. Salazar, Luis E. Salazar, and Thomas J. Houlihan, individually. The note provided for payments of $1,000.00 each month until paid in full. All payments made on the note in 1990 were made from Hot Shots Burgers & Fries, Inc.'s bank account.

In order to secure payment of the $40,-000.00 note, Edward A. Salazar, Luis E. Salazar, and Thomas J. Houlihan executed a combination financing statement and security agreement, conveying a security interest in the modular building to Wheelees. The financing statement was recorded on April 21, 1989, in the office of the Circuit Clerk of St. Francis County, Arkansas, and recorded on April 26, 1989, in the office of the Secretary of State.

The modular building was described by Edward Salazar as a "doublesided drive-through restaurant, much like a Rally's or a Backyard Burger." Record at 44. The modular building had "no dining room inside, it was very efficient kitchen with two windows on either side of a small building, much like a shoebox, and a walk-up window." Record at 44–45. The modular building came equipped with some restaurant equipment such as "[g]rills, fryers, hood, ... shake machine, coolers, [and] freezers." Record at 50. Edward Salazar also stated that "the purpose of a modular building is if it didn't work out, it could be moved.... [I]t allowed us to ... go into business ... at another location." Record at 47.

When the modular building was purchased it was remodeled and operated under the Hot Shots name for a period of time. Edward Salazar decided to close down the Forrest City operation and move the modular building to the Bryant location. When asked how he moved the modular building to Bryant, Edward Salazar testified as follows:

Well, the modular buildings have a concrete curb around them, or they may be welded or bolted to some kind of an anchor or on a pier, on a base. Every one of 'em's a little bit different, but basically the buildings are very heavy. They're steel constructed, and they sit on this pier and there's a crawl space underneath 'em, and you run the utilities up and connect 'em. So you've got to disconnect the utilities, jackhammer the curb around them, figure out a way of raising the building up, getting your running gear underneath, a tongue, you've got to hook it up to a truck, and roll it off.

Record at 57.

Edward Salazar described the procedure for setting up the modular building in Bryant as follows:

Well, we—it was virgin property, had tremendous trees and wasn't graded. So we brought in tons of dirt and we removed all the trees and had surveys done and redone and redone, and got the architect to, you know, to build a—had a set of plans drawn up. Dug out the—for the base where the building was going, poured it with concrete, reinforced it so it was very solid; and prepared all the ground, brought as many utilities to it as possible. And then had the building waiting, rolled the building in, sat it down and started connecting everything to it, all the utilities.

Record at 57–58.

Edward Salazar also said:

Well, the integrity of the building was designed so that it could be moved. I put it on there so hopefully I was going to be there forever. Yeah, it would be, you know, as permanent a structure as possible. But I could remove it if I wanted, if the located failed.

Record at 59.

Edward Salazar testified that "they" operated a restaurant in the modular building in Forrest City for approximately one year before he decided to move the building to a new location in Bryant, Arkansas. In order to accomplish the move it was necessary to

terminate a lease of the real property where the building was situated in Forrest City. The lease agreement was made by virtue of an assignment of an existing lease from Thomas B. Devazier to Edward A. Salazar, Luis E. Salazar, and Thomas J. Houlihan. The documents terminating the lease referred to the lessees as Edward A. Salazar, Luis E. Salazar and Thomas J. Houlihan, individually. The lessor received $11,200.00 consideration for the termination of the lease, which was paid by two cashier checks on which Luis Salazar was indicated as the remitter.

Edward Salazar testified that the debtor corporation owned the building in Bryant. He also testified that when he used the word "we" he was referring to Hot Shots Burgers & Fries, Inc. He stated:

No, no I mean, we worked for the company, we owned the company, and the company owned—. It's one of those things where I always felt that Hot Shots was an extension of myself. At least, you know, it's something I created in my mind and I made it physically happen. So I have a heard time with them being really separated. I always felt that—you know, I was always there.

Record at 125–26. There was no testimony or documentary evidence indicating that the modular building was ever listed on the debtor corporation's records as an asset. There was also no documentary evidence indicating a formal transfer of title from the individuals to the corporation. The building was, however, only used in connection with the business activities of the corporate debtor, Hot Shots.

On May 12, 1989, Hot Shots borrowed $10,000.00 from Twin City. Hot Shots executed a combination financing statement and security agreement to secure repayment of an indebtedness owed to Twin City. The security agreement executed by Hot Shots granted a security interest in the following collateral:

Equipment: All equipment including, but not limited to, all machinery, . . . manufacturing equipment.

The financing statement described the collateral as "[a]ll equipment now owned and hereafter acquired for use in debtor's business as now conducted and hereafter to be conducted." Twin City's financing statement and security agreement was filed of record with the Circuit Clerk of Pulaski County on May 18, 1989, and with the Secretary of State on May 30, 1989.

On July 30, 1990, Hot Shots borrowed $150,000.00 from Union Bank. To secure the indebtedness, Hot Shots executed a mortgage in favor of Union Bank to real property located in Bryant, Arkansas, where the modular building was placed. The mortgage contained the following language: "Together with all the improvements now or hereafter erected on the property, . . . and all fixtures now or hereafter a part of the property." The mortgage was filed of record in the office of the Circuit Clerk of Saline County, Arkansas, on July 31, 1990.

### A. Real or Personal Property?

Arkansas courts have adopted a three-part test to determine whether an item is a fixture: (1) whether the item is annexed to the realty; (2) whether the item is appropriate and adapted to the use or purpose of that part of the realty to which the item is connected; and (3) whether the party making annexation intended to make it permanent. *McIlroy Bank & Trust Fayetteville v. Federal Land Bank of St. Louis*, 266 Ark. 481, 585 S.W.2d 947, 948 (1979) (citing *Choate v. Kimball*, 56 Ark. 55, 19 S.W. 108 (1892)). The third part of the test, the intention of the party making the annexation, has been held to be the primary factor to rely on in making the determination. *Bank of Mulberry v. Hawkins*, 178 Ark. 504, 10 S.W.2d 898, 899 (1928); *Continental Gin Co. v. Clement*, 176 Ark. 864, 4 S.W.2d 901, 902 (1928); *Choate v. Kimball*, 19 S.W. at 109. The party's intention can be "inferred from the nature of the chattel, the relation and situation of the party making the annexation, the structure and mode of annexation and the purpose for which the annexation has been made." *Corning Bank v. Bank of Rector*, 265 Ark. 68, 576 S.W.2d 949, 952–53 (1979) (citing *Ozark v. Adams*, 73 Ark. 227, 83 S.W. 920 (1904)).

Although Union Bank presented some evidence regarding the debtor's intention to construct the modular building on the Bryant real estate permanently, the evidence is more persuasive that the building was not intended to be permanently constructed on the real estate. The building had already been moved from the Forrest City location to the Bryant location, and Edward Salazar testified that if the Bryant location was not successful, the building would be removed to another location. In fact, Edward Salazar testified that the reason he used modular construction was to enable him to move buildings to different locations if necessary. Significantly, the trustee sold the building and it was removed by the purchaser.

The first two parts of the test to determine whether the building had become a fixture were discussed in a previous decision where a modular building similar to the one constructed in Bryant was determined to be personal property, not real property. *In re Hot Shots Burgers & Fries, Inc.*, 147 B.R. 484, 488 (Bankr.E.D.Ark.1992). The evidence in this case regarding the nature and structure of the building in question is not significantly different from the evidence in the previous case, therefore, for the reasons given in the earlier case the Court finds that the modular building is not a permanent fixture and not part of the real estate. Therefore, the modular building is not subject to the Union Bank's mortgage lien on the real property located in Bryant.

### B. Owner of Modular Building

The next issue for determination is which one of the parties, if any, has a properly perfected security interest in the modular building as a trade fixture. Disputes regarding the validity and perfection of encumbrances in property of the estate are governed by nonbankruptcy law, mostly state law. *See TMIC Industrial Cleaning Co. v. O'Reilly Automotive, Inc.*, 19 B.R. 397 (Bankr.W.D.Mo.1982); 4 *Collier on Bankruptcy* ¶ 544.02 (Lawrence P. King ed., 15th ed. 1987). The applicable law in this case is contained in Arkansas' version of the Uniform Commercial Code. Ark.Code Ann. §§ 4–9–101 to 4–10–104 (Michie Repl.1991).

For a creditor to have a perfected security interest in personal property, several requirements must be met. The debtor must have rights in the collateral, the debtor must sign a security agreement, which contains a description of the collateral, in favor of the secured party, and value must be given between the debtor and the secured party. *See* Ark.Code Ann. § 4–9–203(1)(a)–(c) (Michie Repl.1991); *Findley Machinery Co. v. Miller*, 3 Ark.App. 264, 268, 625 S.W.2d 542, 544 (1981); *Bank of Yellville v. Scott (In re Scott)*, 113 B.R. 516, 523 (Bankr.W.D.Ark. 1990).

Wheelees argues that the first requirement has not been met in this case because the debtor, Hot Shots, had no interest in the modular building and could not grant a lien in the building to anyone. The evidence is not disputed that at the time the modular building was sold by Wheelees it was sold to Edward Salazar, Luis E. Salazar, and Thomas J. Houlihan, as individuals. The security interest granted by the individuals to Wheelees attached to the building when the security agreement was executed. *See* Ark.Code Ann. § 4–9–203(c)(2) (Michie Repl.1991). There is no credible evidence that the modular building was ever formally transferred or conveyed to the debtor corporation.

Admittedly, the building was treated by the officers of the debtor as if it were an asset of the corporation. The parties' conduct indicates that the officers, as well as the banks, believed they were conveying a lien or security interest in the building, and there is no evidence of fraud. The banks were in the position to protect their interest by requiring proof of corporate ownership of the property they sought to encumber with a security interest.

Therefore, based on the record presented, the modular building is determined to be property owned by the individuals, Edward Salazar, Luis Salazar and Thomas Houlihan, and the proceeds from the sale of the modular building are subject to the claim of a security interest by Wheelees. The claims by Union Bank and Twin City cannot be sustained because Hot Shots never held an ownership right in the modular building. *See* Ark.Code Ann. § 4–9–203(1) (Michie

Repl.1991). The trustee's claim cannot be sustained because the proceeds do not constitute property of the estate.

The apparent owners of the property in question are not parties to this action, therefore, this Court lacks personal jurisdiction to determine the remaining issue of whether the claim of lien by Wheelees is perfected and/or enforceable against the individuals. Therefore, the trustee is ordered to join Edward Salazar, Luis E. Salazar and Thomas J. Houlihan for further proceedings consistent with this opinion to determine the validity of Wheelees' claim of lien in the modular building.

### PROCEEDS FROM THE SALE OF PERSONAL PROPERTY IN BRYANT (OTHER THAN THE MODULAR BUILDING)

■ A security interest in equipment is perfected when a valid financing statement is properly filed of record. *Bank of Yellville v. Scott (In re Scott)*, 113 B.R. at 520. The proper place to record a financing statement in equipment is "in the office of the Secretary of State and in addition, if the debtor has a place of business in only one county of this state, also in the office of the clerk of the circuit court and ex officio record of such county." *See* Ark.Code Ann. § 4–9–401 (Michie Repl.1991).

Where the debtor has given more than one security interest in the same property, the priority to be applied in the case of conflicting security interests is governed by Ark. Code Ann. § 4–9–312(5)(a) (Michie Repl. 1991), which provides as follows:

In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4) of this section), priority between conflicting security interests in the same collateral shall be determined according to the following rules:

(a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is fist

perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

(b) So long as conflicting security interests are unperfected, the first to attach has priority.

Ark.Code Ann. § 4–9–312(5)(a) (Michie Repl. 1991).

The trustee sold miscellaneous restaurant equipment which was located at the Bryant location. Wheelees, Twin City, and Union Bank each claim entitlement to the sale proceeds.

Wheelees' claim is based on the previously described financing statement and security agreement executed by the individuals, Edward Salazar, Louis Salazar, and Thomas Houlihan, which was filed of record with the Circuit Clerk of St. Francis County on April 21, 1989 and with the Secretary of State on April 26, 1989. Wheelees' financing statement and security agreement describes its collateral as "All equipment including heat and air located in the building ... and all replacements thereof." Also attached to the financing statement and security agreement is a list of twenty-four separate items of equipment.

Twin City's claim is based on a security agreement and financing statement executed by the debtor corporation that was filed of record with the Circuit Clerk of Pulaski County on May 18, 1989, and with the Secretary of State on May 30, 1989. Twin City's financing statement and security agreement describes the collateral as "all equipment now owned or hereafter acquired for use in the debtor's business as now conducted and hereinafter to be conducted."

Union Bank's claim is based on a security agreement and financing statement executed by the debtor corporation that was filed of record with the Circuit Clerk of Saline County, Arkansas, on August 15, 1990, and with the Secretary of State August 14, 1990. Union Bank's financing statement and security agreement describes its collateral two ways. First by marking a box containing a preprinted description as:

All equipment including, but not limited to, ... fixtures,.... Any equipment de-

scribed in a list or schedule which I give to you will also be included in the secured property, but such a list is not necessary for a valid security interest in my equipment.

Also attached to the financing statement and security agreement is a list itemizing thirteen separate items of restaurant equipment.

When the modular building was purchased in 1989, the individuals operated a fast food restaurant using the name of the corporation in St. Francis County, Arkansas, on land leased by the individuals. The individuals were also the officers of the corporation. The debtor corporation operated a second business in Pulaski County, Arkansas. Prior to 1989, the debtor only operated a business in Pulaski County, Arkansas. The evidence of the officers' failure to observe corporate formalities in regard to the corporate business activities has been stated previously.

### Wheelees vs. Twin City

In this case, Wheelees filed its financing statement prior to the financing statement filed by Twin City; however, Wheelees received its security interest from the individuals, whereas Twin City received its security interest from the debtor. Both security interests cover "all equipment" owned by the grantor of the security interest. Some equipment was originally purchased by the individuals from Wheelees and apparently never conveyed to the corporate debtor. There was no conclusive evidence presented at the trial indicating what portion, if any, of the equipment sold by the trustee was originally purchased from Wheelees by the individuals and what portion was purchased by the debtor corporation.

Edward Salazar testified:

Q: The building and equipment at the Bryant location, how did Hot Shots acquire them?

A: Well, we purchased some of them; some of them came with the Wheelees building; some of them were purchased.

Record at 123.

Q: Excuse me, when you say "we", could you be a little more specific?

A: Hot Shots Burgers & Fries.

Record at 125.

Q: I'm going to ask you to have Plaintiff's Exhibit Number 1 and Union Bank of Benton Exhibit Number 5. Your first item listed on Equipment Sold From the Hot Shots Store in Bryant, Arkansas is the food warmer for $45.00. Do you see that?

. . . .

A: Yes, I do.

Q: Is this the same food warmer referred to on the list on UBB Number 5, "1—hatco foodwarmer with shelf system"?

A: You want to know if the food warmer on this list, Number P, is the same on this list.

Q: Correct.

A: That's what you want to know.

Q: Correct.

A: I don't know.

Q: I'm going to refer you on the list of equipment sold again, number 11, Savory Bun Toaster, $95.00. Again, the same question on Union Bank of Benton's list, there's "1—savory bun toaster 220 volts ..." Is this the same piece of equipment?

A: There would be no way for me to know that.

Q: Well, sir, when you gave this collateral as security for the loan, did you have it specified as to what collateral you were giving to the bank?

A: I don't remember. But I wasn't here, I don't know where this list came from. Is this—?

THE COURT: Is that going to be your answer to every question?

A: Is this what was sold? Is that what this is?

Q: Correct.

A: I wasn't at the sale, I don't know what was in there.

Q: Well, did you have more than one Savory Bun Toaster at the time?

A: Sure.

Q: All right. I'm going to refer you down to Unit Number 20, stainless

steel under the counter refrigerator, single. It was sold for $90.00?

A: Somebody got a good deal.

Q: There's also on the same list the Economy Gas Griddle, the Frymaster double deep fryer with stand, the 7–feet Vend-a-Hood with fire chemical system, three compartment stainless steel sink, stainless steel double door refrigerator and stainless steel triple door refrigerator. Do you see those items listed on the copy that was sold?

A: Yes, I do.

Q: Can you tell me whether or not any of the equipment was sold was the same equipment that you gave a security interest to the Union Bank of Benton on?

A: I'm sure some of it was, but I could not specifically tell you what was and what wasn't.

Q: Did you have more than one three-door freezer?

A: Oh, yeah.

Q: At that one location in Bryant?

A: I don't remember if we had—I think we had two, maybe three.

Q: Did you have more than one air hood?

A: No, no, there was only—well, actually, I think the Health Department made us put another one in, 'cause we also had a fryer and a—. Let me think about the designer. That was a little tricky store over there. We ended up buying some additional—fabricating some additional equipment because the hood would not take care of a grill that we bought for that 'cause we were broiling hamburgers over there versus grilling them in the other places.

Q: Did you frequently shift equipment around from one store to the other?

A: Pretty much so, yes. Commercial equipment breaks down, it's under a tremendous amount of use and it breaks down. So we would buy and remove equipment or fix equipment, and some things worked better in other locations and—.

Record at 129–32.

Q: I just want to, I guess, one more time make something clear. In this commercial business, from time to time you'd have equipment break down, is that correct? And you would either have to take it out and put new equipment in or else move it to a different location? Is that correct?

A: We had a warehouse, and we would fix the equipment or we would take the equipment somewhere to get it fixed.

Q: And so while it was fixed you would bring in a new piece of equipment. and then when that got fixed either put it—you might put it in the warehouse, or you might put it back where it came from, or you might put it somewhere else where it was needed. Is that correct?

A: Plus we felt that, you know, we were going to grow so if we had one extra fryer or grill or something, it could always go to work.

Q: So there's no way, is there, I guess, there's no way you can be certain that these exact same items that were listed on this UBB 5 were, in fact, the same exact items that were sold by the Trustee on that list that was shown to you earlier as Trustee's 1, can you?

A: I don't see how I could.

Record at 136.

Q: So what happened by the time you got to borrowing money from UBB or TCB or whomever it might have been down the line, as those things wore out, broke, or whatever, you would replace them with something else. Is that right?

A: Or if they didn't work out. I mean, they didn't necessarily have to break, they might not have worked out in trying to get the operation to be more efficient, or if there was a change in the menu or something we'd come up with—

Q: You'd replace 'em.

A: Right.

Q: And what you brought in was a replacement for what you took out.

A: Not necessarily. It could be, you know, an addition to or a subtraction from or something. I think for the first year we were doing corn dogs and we decided not to do corn dogs any more. So we might have taken that particular small fryer out, you know.

Q: Refrigerators, cookers, sinks, those kinds of things, you always have to have those.

A: Have to, yes.

Q: And if it broke, you'd replace it with another one.

A: Close enough.

Q: Yes?

A: Yes.

Record at 137–38.

Cross Examination by Mr. Baker:

Q: Mr. Salazar, I take it that you cannot tell by looking at the list of the equipment that the Trustee sold at Bryant where any one of those pieces of equipment came from?

A: That's correct.

Q: It would have come from the equipment that was bought at Wheelees? That could be one source, could it not?

A: Well, I think there's something like a couple of years difference between the buying and the selling, and the operations changed a lot, and we were constantly developing so—.

Q: Some of those pieces of equipment could have been the same, though, couldn't they? Could have come over from Forrest City?

A: Oh, yeah. I'm sure some of it, yeah.

Q: And some of the things that were sold could have been property, equipment, that you had at the time you gave a lien to Twin City Bank.

A: I'm sure.

Q: Is that right? And some of the equipment could have been equipment that was purchased in the meantime.

A: We were buying equipment regularly.

Record at 139–40.

The evidence as to what items of personal property are encumbered by Wheelees' original security interest and what items constitute new equipment purchased by the corporation and encumbered by Twin City's security interest is at best ambiguous. In an analogous situation, an ambiguity of this nature was resolved by determining which party has the burden of proof and ruling against that party. *See In re Mendenhall*, 54 B.R. 44 (Bankr.W.D.Ark.1985). The burden of persuasion is often allocated to the party asserting affirmative allegations. *See In re Old World Cone Co.*, 119 B.R. 473, 478 (Bankr.E.D.Pa.1990) ("Generally, the burden of proof is upon a party seeking to recover funds from another."); *Carlson v. W.J. Menefee Constr. Co. (In re Grassridge Indus., Inc.)*, 78 B.R. 978 (Bankr.W.D.Mo.1987) ("[T]he burden of proof as to the issue of whether the Bank's lien reaches post petition property lies with the Bank.")

This action is in the nature of an interpleader action. The real dispute in regard to the equipment from the Bryant store is between two creditors, each of whom bear the burden of proof to establish their respective security interest. The trustee sold forty-seven separate items of restaurant equipment from the Bryant store, however, none of the property sold was identified by the trustee by serial number. The trustee's list of property sold is, however, itemized. The equipment, Wheelees' security interest attached to, was also itemized in a list attached to its financing statement. Twin City's security interest was described in general as "all equipment" of the debtor. There are four items of property on the trustee's list which appear to refer to equipment contained on Wheelees' list. They are:

Trustee's list: Delfield under counter refrigerator (double)

Wheelees' list: Delfield 2 door reach-in refrigerator

Trustee's list: 3 compartment S.S. sink

Wheelees' list: 3 compartment stainless steel sinks

Trustee's list: Savory bun toaster

Wheelees' list: Savory bun warmer

Trustee's list: Scotsman Ice Maker

Wheelees' list: Scotsman 500# ice machine

Wheelees has failed to specifically identify any other collateral sold by the trustee as being its collateral and Twin City has failed to establish that the four items listed above were not already encumbered by Wheelees' security interest, whether or not that equipment was subsequently conveyed to the corporation.

■ Twin City argues that Wheelees' security interest is not perfected because Wheelees failed to file its security interest in the county of the individuals' place of business. The validity of the conflicting claims of liens can be determined only by determining who the owner of the property was at the time the respective liens were granted. However, since the individuals have not been made parties to this action, this Court lacks personal jurisdiction to make this determination. Therefore, the trustee is ordered to join Edward Salazar, Luis E. Salazar and Thomas J. Houlihan for further proceedings consistent with this opinion to determine the validity of the competing lien claims.

### Twin City vs. Union Bank

■ The financing statement filed by Twin City Bank was filed prior to the financing statement filed by Union Bank. Twin City filed its documents with the Circuit Clerk of Pulaski County and with the Secretary of State. Union Bank filed its documents with the Circuit Clerk of Saline County and with the Secretary of State. At the time both security interests were created the debtor, Hot Shots, maintained a place of business in more than one county.

Ark.Code Ann. § 4–9–401(1)(c) (Michie Repl.1991) provides guidance for the proper place to file a financing statement as follows:

> In ... the office of the Secretary of State and in addition, if the debtor has a place of business in only one county of this state, also in the office of the clerk of the circuit court.

Since the debtor had a place of business in more than one county, the security interest is perfected when the financing statement is filed with the Secretary of State's office. *See American Cyanamid v. McCrary's Farm Supply, Inc. (McCrary's Farm Supply, Inc.),* 705 F.2d 330 (8th Cir.1983). Twin City's financing statement was filed with the Secretary of State's office prior to Union Bank's financing statement. Pursuant to Ark.Code Ann. § 4–9–312(5)(a) (Michie Repl.1991), Twin City's security interest has priority over the claim of Union Bank in the proceeds from the sale of property determined to be property of the estate. *See Affiliated Foods Stores, Inc. v. Farmers & Merchants Bank,* 300 Ark. 450, 780 S.W.2d 20 (1989).

### CONCLUSION

For the reasons stated, the Court finds that the proceeds from the sale of personal property in Geyer Springs should be paid to Twin City in the sum of $3,332.10, less the trustee's attorney fees and costs of $620.00. The Court further finds that the modular building in Bryant, Arkansas, is not part of the real estate and not subject to Union Bank's mortgage lien.

The trustee is ordered to join Edward Salazar, Luis E. Salazar, and Thomas J. Houlihan in this action for further proceedings consistent with this opinion to determine the distribution of proceeds from the sale of the modular building and other personal property located in Bryant, Arkansas.

A separate judgment will be entered consistent with this memorandum opinion pursuant to Bankruptcy Rule 9021.

IT IS SO ORDERED.